Filed 7/17/15  P. v. Martinez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060393 |
| v. | (Super.Ct.No. FSB050723) |
| JOSHUA MARTINEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  William Jefferson Powell IV, Judge.  Affirmed.

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Senior Assistant Attorney General, and William M. Wood and Brendon W. Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

1

Defendant Joshua Martinez gave Christopher Powers some methamphetamine in exchange for a beat-up old pickup truck. Defendant then enlisted Ravenna Waters to help him sell the truck. Thus, Waters was present when Powers admitted to defendant that he did not have the pink slip to the truck and, minutes later, when defendant shot Powers, killing him.

About a day after the shooting, Waters's car broke down. Five or six cars started circling her. Defendant was in one of the cars; he rolled down his window and stared at her. Defendant was a member of the North Side Colton gang; a gang expert testified that defendant's act of surrounding and intimidating Waters was committed for the benefit of the gang.

After a jury trial, defendant was found guilty as follows:

Count 1: First degree murder (Pen. Code, §§ 187, subd. (a), 189), with an enhancement for personally and intentionally discharging a firearm and causing great bodily injury (Pen. Code, § 12022.53, subd. (d)).

Count 2: Dissuading a witness by force or threat (Pen. Code, § 136.1, subd. (c)(1)), with a gang enhancement (Pen. Code, § 186.22, subd. (b)(1)(C)).

As a result, defendant was sentenced to a total of 61 years to life in prison, along with the usual fines, fees, and directives.

2

Defendant now contends:

1. The trial court erred by admitting statements that were the result of custodial interrogation after defendant had invoked his right to remain silent and his right to counsel.

2. There was insufficient evidence to support the gang enhancement.

3. The trial court erred by denying defendant's motion to bifurcate the trial of the gang enhancement.

4. The trial court erred by imposing a restitution fine without considering defendant's ability to pay.

We find no reversible error. Hence, we will affirm.

I

FACTUAL BACKGROUND

A. *Prosecution Evidence Regarding the Crimes*.

Ravenna Waters was in the business of buying and selling vehicles. She lived with Charles Dedrick; they had a one-year-old son together. Waters also had two older sons who were friends with defendant and who had introduced him to her. Waters knew defendant only as "Cartoon."

On June 15, 2005, defendant came to Waters's house in Muscoy. He asked her to help him sell a truck. He said the truck belonged to someone else, who would provide the pink slip.

Later that day, defendant came back. He was in a gray late 1980's Nissan pickup truck, which had some front-end damage. He was accompanied by Christopher Powers, who was identified to Waters as the owner of the truck.

Defendant left the truck with Waters. At his request, Waters gave him and Powers a ride to Powers's girlfriend's house. Waters was driving her red Ford van. The gas gauge was broken, and the van had to be started with a screwdriver.

During the drive, Powers told defendant that he did not have the pink slip to the truck. Defendant got angry.

When they got to the girlfriend's house, defendant told Powers to "go get some dope." Powers went in and asked his girlfriend if she had any methamphetamine. She said no.[1] When Powers came back and said "he couldn't get any dope," once again, defendant was angry.

Waters said she was going home; she refused to drive defendant and Powers anywhere else, so they went with her. When they were on Cajon Boulevard near Kendall Drive, the van "sputtered and died." Waters assumed it was out of gas. Defendant suggested they all go back to the girlfriend's house and siphon some gas. Waters refused to leave her van unattended.

Defendant got upset. However, he said that just he and Powers would go. As soon as they got out, defendant pulled out a gun and shot Powers in the head four times.

---

[1] Powers also told his girlfriend that he had sold his truck for an eight-ball of methamphetamine.

Waters tried frantically to restart the van. She thought that, unless she drove away, defendant was going to kill her. Once she managed to get it restarted, however, she realized that he was already in the van, sitting next to her.

Waters testified that defendant told her that "he wasn't letting me out of his sight, he was going to rape me, kill me. When he was done, that he was going to fuck the man that I was with and then kill him, that he was going to kill my grown sons, and that he was going to keep my baby." Defendant ordered her to drive to his house. She said, "[N]o, I'm going to check on my son." He "looked at [her] like, you brave bitch."

They got back to Waters's house several hours after they had left. Defendant followed Waters in. He acted "like he owned the place[.]" He washed his hands and made himself a sandwich. Waters could not tell Dedrick about the shooting because defendant "was sitting right there."

Defendant wanted Waters to go with him to help him sell the truck, but Dedrick said it was too late. Defendant left, but he asked Dedrick to follow him home; he explained that the truck had expired tags. Dedrick did so. After about five minutes, defendant pulled over and waved to Dedrick to go on. Dedrick went to a grocery store before going back home. Meanwhile, Waters did not call the police, because she was "scared."

Just minutes after Dedrick got back home, defendant came back again. Once again, defendant wanted Waters to go with him, and once again, Dedrick said it was too late. Defendant left. Thus, Waters finally managed to tell Dedrick about the shooting.

5

Around 2:00 or 3:00 a.m., defendant returned yet again. This time, he was accompanied by another Hispanic man. Defendant still wanted Waters to go with him, but Dedrick said no. Defendant and the Hispanic man "[p]rowl[ed] around the yard" for maybe 15 minutes before finally leaving. Waters "felt that they were trying to get [her] outside."

Around 6:00 a.m., Waters and Dedrick took their baby, left their house, and went to stay with a friend.

Meanwhile, around 2:00 a.m., a bicyclist found Powers's dead body lying by the side of Cajon Boulevard, near Kendall Drive; he called 911. Powers had methamphetamine in his system when he died.

On June 17, 2005, Waters's van broke down again near H and Marshall Streets in San Bernardino. Some five or six cars started circling her. Defendant was in one of these cars; he rolled down his window and made eye contact with her.

Later that day, Dedrick went back to his house to get some clothing. While he was there, defendant showed up. To mislead defendant, Dedrick asked if he knew where Waters and the baby were. Defendant asked Dedrick to come outside and talk to him. Dedrick declined, saying he had to meet up with some people.

Defendant went and talked to Waters's adult sons. Later, a friend told Dedrick that defendant and "the boys" (meaning Waters's sons) were at Waters's house, taking items from their house, their shed, and their cars. Dedrick called the police and had one

6

of Waters's sons arrested. Waters wanted her son to be in custody so he would be safe from defendant.

Waters then contacted the police and reported the shooting. In a photo lineup, she identified defendant as the shooter.

On June 20, 2005, the police searched defendant's house. They did not find the gray pickup truck. However, they did find .22 long-rifle caliber rim-fire bullets. Bullet fragments recovered from Powers's head were also .22 long-rifle caliber rim-fire.

Waters's van was fingerprinted, but defendant's fingerprints were not found.

Meanwhile, on June 18, 2005, defendant had been arrested for absconding. On June 23, 2005, the police interviewed him. They told him that they were there to talk about a gray Nissan pickup truck. He said he had bought the truck from a short, five foot seven inch[2] White or Hispanic guy in exchange for a quarter of an ounce of methamphetamine. He claimed the truck was parked behind his house.

B.    *Prosecution Gang Evidence*.

According to a gang expert, defendant was an active member of a gang called North Side Colton, as shown by his tattoos, his associations, and his own admissions. His moniker was Cartoon.

North Side Colton had common signs or symbols, including NSC, NC, and University of North Carolina logos. Their primary activities included robberies,

---

[2]     Powers was five feet five inches tall.

7

methamphetamine sales, and marijuana sales. Gang members had been convicted of at least five predicate offenses: (1) an assault with a deadly weapon committed in January 2002, (2) a carjacking committed in December 2002, (3) an assault with a deadly weapon committed in October 2003, (4) unlawful taking or driving of a vehicle committed in November 2003, and (5) an assault with a deadly weapon committed in January 2004.

The gang expert opined, in hypothetical form, that the incident in which defendant and others circled Waters was committed for the benefit of his gang.

C.    *Defense and Rebuttal Evidence*.

As of 2005, Sheila Rodarte was defendant's girlfriend. On June 15, 2005, Rodarte's daughter Erica had eye surgery. Shortly after Erica was anesthetized, Rodarte drove to her house, picked up defendant, and brought him to the hospital. The whole trip took 20 or 25 minutes. When they got back, Erica was still in surgery. Defendant stayed in Erica's room with her until she was discharged the next morning.

According to hospital records, Erica Rodarte was in the hospital from 6:00 p.m. on June 15, 2005 until 6:45 a.m. on June 16, 2005. She was anesthetized at 7:00 p.m., and she had an operation that lasted from 7:23 p.m. until 8:07 p.m.

When the police interviewed Rodarte, she did not tell them that defendant had an alibi for the time when the shooting occurred.

Rodarte also testified that defendant used to have a long-barreled revolver that he carried around in his pocket. About a week after the shooting, however, he told her that he no longer had the gun.

8

On July 19, 2005, defendant spoke to Rodarte on the phone from jail. In that call, defendant said that he had bought a truck for a quarter-ounce of dope. The seller did not have the "bill of sale" and was going to give it to defendant later. Defendant said the truck was parked behind his house.

In addition, defendant said that, when Erica had her surgery, he got to the hospital around 3:45 a.m.

II

CONTINUED QUESTIONING AFTER DEFENDANT INVOKED HIS RIGHTS

Defendant contends that the trial court erred by admitting statements that he made to the police after he had invoked his right to remain silent and his right to counsel.

A. *Additional Factual Background.*

The following facts are taken from the evidence that was before the trial court when it ruled on defendant's motion to suppress. (See part II.B, *post*.)

On June 23, 2005, two sheriff's deputies interviewed defendant. At the time, defendant was in custody on a parole violation. (In our quotations from the transcript of the interview, all ellipses are in the original; brackets indicate alterations.)

Defendant asked if he was going to be "cut loose[.]" A deputy replied, "No, I don't know, I don't work . . . I'm not your parole officer or nothing like that, I'm a [d]eputy so . . . I . . . I don't have anything to do with that."

The deputies gave defendant *Miranda* warnings (see generally *Miranda v. Arizona* (1966) 384 U.S. 436); defendant said he understood them. This discussion followed:

9

"[DEFENDANT]: I . . . I . . . I really *if this isn't pertain to my . . . my . . . my parole then I really don't have nothing to say to anybody*.

"[DEPUTY]: [O]k . . . well let me . . . let me tell you what's up. Where here . . . all's we[']re here to talk to you about is a . . . a truck. A [g]ray truck ok? And how you ended up with the truck over in . . . in Muscoy at the pad. That's all . . . [w]e want to know about. The [t]ruck so how did you end up with the truck?

"[DEFENDANT]: It was through a dope deal.

"[DEPUTY]: Ok, just telling . . . I'm not . . . look I'm not from parole, I don't really care about that part of it, I[']m not gonna run and make a big report ok? Ok? But I just want to know about how the truck got on there, ok so it[']s through a dope deal . . . What ha . . . what happened? Or what . . . what . . . what kind of dope deal?

"[DEFENDANT]: Ha . . . this is gonna fuck my parole up.

"[DEPUTY]: No, I'm not gonna even . . . I'm not gonna contact your parole officer[.]

"[OTHER DEPUTY]: (Unintelligible)

"[DEPUTY]: I'm not, we just need the info on the truck and how you got it and all that stuff we need to track it . . . you know what I'm saying? Ok? Just be straight with us, that's it." (Italics added.)

The deputies proceeded to question defendant. Defendant confirmed that he had been staying at 2455 Second Avenue in Muscoy. He said that he gave a quarter of an ounce of dope to a Mexican "dude," who was short, about five feet seven inches tall, in

exchange for the truck. Defendant confirmed that he was referring to "the truck that's in the . . . in the back of my house."

Then there was this exchange:

"[DEFENDANT:] *[C]an I get a lawyer?* Or something like that? Cause am I . . . am I a GTA now? Cause of the damn truck . . . has to do with the truck stolen? Cause I didn't steal the damn truck[,] I bought the truck.

"[DEPUTY]: You bought it?

"[DEFENDANT]: Yah, well it's not legal (Unintelligible) dope but . . . still it[']s (Unintelligible)[.]

"[DEPUTY]: (laughing) [W]ell yah a quarter ounce of dope[.]

"[DEFENDANT]: It's still a quarter ounce[.]"

"[DEPUTY]: Yah . . . a quarter . . . I understand, ok[,] look we need to know your story cause uh we're hearing some other stuff about the truck and about . . . and about how you got the truck.

"[DEFENDANT]: (Unintelligible)

"[DEPUTY]: We're hearing something else about how you got that truck.

"[DEFENDANT]: [A]s in what?

"[DEPUTY]: As in this little White dude's dead, shot in the head and we have people saying that you're the one who shot him for the truck. And that's why we're here to find out your side of the story.

"[DEFENDANT]: *Man, I need a lawyer.*

11

"[DEPUTY]: [Y]ou need a lawyer?

"[DEFENDANT]: [Y]ah, this is . . . this is bullshit.

"[DEPUTY]: Well it's your right. I mean . . . yah definitely we just want to hear your side of the story.

"[DEFENDANT]: That's . . . that's what's going on man that's . . . that's how it went down.

"[DEPUTY]: Okay.

"[DEFENDANT]: I got 6 . . . 6, 7 cars right there on my property I don't need to shoot nobody for no god damn truck." (Italics added.)

The deputies assured defendant that they had to "respect" his request for an attorney; however, they repeatedly insisted that they wanted to hear his "side of the story." Defendant said, "I have nothing to do with it." He added, "You going after the wrong guy."

B.      *Additional Procedural Background.*

Defense counsel filed a written motion to suppress defendant's statements. After hearing argument, the trial court denied the motion.

With respect to defendant's statement, "[I]f this isn't pertain to my . . . my . . . my parole then I really don't have nothing to say to anybody," it ruled: "[T]hat is not an assertion of silence, but equivocal statements. It's not certain that he does not want to talk. He uses terminology that indicates that he kind of doesn't want to talk, but hasn't really made up his mind yet is how I read that statement."

12

With respect to defendant's statement, "[C]an I get a lawyer?," it ruled: "He is giving more information after asking for a lawyer, continuing to talk, indicating that he was not firmly asserting his right to counsel, but rather as part of an ongoing colloquy."

Accordingly, defendant's statements that (1) he lived at 2455 Second Avenue in Muscoy, (2) he gave a quarter of an ounce of methamphetamine to a short, five foot seven inch White or Hispanic guy[3] in exchange for a gray truck, and (3) the truck was parked behind his home, were admitted into evidence.

C.    *Discussion*.

"In reviewing a trial court's *Miranda* ruling, we accept the court's resolution of disputed facts and inferences and its evaluations of credibility, if supported by substantial evidence, and we independently determine, from the undisputed facts and facts properly found by the trial court, whether the challenged statement was illegally obtained. [Citation.]  Where, as here, a defendant's statements to the police are undisputed, 'we engage in a de novo review of the legal question of whether the statement at issue was [admissible]." (*People v. Shamblin* (2015) 236 Cal.App.4th 1 [Fourth Dist., Div. Two], petn. for rev. filed May 26, 2015.)

"Under *Miranda* and its progeny, 'a suspect [may] not be subjected to custodial interrogation unless he or she knowingly and intelligently has waived the right to remain

---

[3]    According to the transcript of the interview, defendant said the guy looked Mexican.  Nevertheless, the testimony at trial was that defendant described him as "some [W]hite guy," "he could have been Hispanic or [W]hite."

13

silent, to the presence of an attorney, and, if indigent, to appointed counsel.' [Citation.] If at any point in the interview the suspect invokes the right to remain silent or the right to counsel, 'the interrogation must cease.' [Citations.]" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1104-1105.)

"The prohibition against further questioning in these circumstances is not a constitutional requirement, but rather a prophylactic rule '"designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights."' [Citation.]" (*People v. Nelson* (2012) 53 Cal.4th 367, 376.)

A suspect's invocation of the right to silence must be "unambiguous and unequivocal." (*People v. Nelson*, *supra*, 53 Cal.4th at p. 377.) "'[I]f an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression "if they guess wrong."' [Citation.] In such circumstances, suppression of a voluntary confession 'would place a significant burden on society's interest in prosecuting criminal activity.' [Citation.]" (*Id*. at p. 378.)

"A defendant . . . 'may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate "an interrogation already in progress."' [Citation.]" (*People v. Thomas* (2012) 211 Cal.App.4th 987, 1005.) "A defendant has not unambiguously and unequivocally invoked his right to remain silent when his statements . . . amount only to a refusal to discuss a particular subject. [Citations.]" (*Id*. at pp. 1005-1006.)

14

For example, in *People v. Silva* (1988) 45 Cal.3d 604, the defendant was Mirandized. He answered some questions, but when asked if he was driving the truck involved in the homicide (see *id*. at p. 615), he said, "I really don't want to talk about that." (*Id*. at p. 629.) The interview continued, and he did answer some questions, but he avoided answering questions that "concentrat[ed] [on] the[] homicide." (*Ibid*.) The Supreme Court held that the defendant had not refused to continue the interrogation, and thus he had not exercised his privilege against self-incrimination. (*Ibid*.) It observed: "A defendant may indicate an unwillingness to discuss certain subjects without manifesting a desire to terminate 'an interrogation already in progress.' [Citation.]" (*Id*. at pp. 629-630.)

Here, defendant's statement, "if this isn't pertain to . . . my parole then I really don't have nothing to say to anybody," was merely a refusal to discuss certain subjects. By necessary implication, it meant that, if the interrogation *did* pertain to defendant's parole, defendant did *not* want to end it. Hence, the officers were not required to terminate the interrogation at that point.[4]

---

[4] Under *Doyle v. Ohio* (1976) 426 U.S. 610, the fact that a defendant who received *Miranda* warnings remained silent cannot be used to impeach the defendant's testimony at trial.

Some federal courts have held that, for purposes of *Doyle*, a defendant's post-warning silence on some but not all subjects cannot be used to impeach him or her. (E.g., *Hurd v. Terhune* (9th Cir. 2010) 619 F.3d 1080, 1087-1088; *United States v. Harrold* (10th Cir. 1986) 796 F.2d 1275, 1279, fn. 3.)

These cases are not controlling here. The United States Supreme Court has emphasized the need for bright-line rules on when questioning must cease: "A

*[footnote continued on next page]*

Separately and alternatively, even assuming the continued interrogation was unconstitutional, the admission of defendant's subsequent statements was harmless beyond a reasonable doubt. The statements that were admitted were to the effect that (1) defendant lived at 2455 Second Avenue in Muscoy, (2) defendant gave a quarter of an ounce of methamphetamine to a person meeting Powers's description in exchange for a gray truck, and (3) the truck was parked behind defendant's house.

However, in the jailhouse phone call with his girlfriend — which was audiotaped and played for the jury — defendant made essentially identical statements. He said, "I bought a truck for some dope." "I gave em . . . they wanted . . . they wanted a quarter ounce for it right?" He indicated that it was Waters who "brings this dude over," and the two of them "want to sell this truck." He also said, "It was there the night I got busted. . . . [I]t was parked in the back." Finally, there was ample other evidence, including the testimony of defendant's ex-girlfriend, that he was staying at 2455 Second Avenue.

---

*[footnote continued from previous page]*
requirement of an unambiguous invocation of *Miranda* rights results in an objective inquiry that 'avoid[s] difficulties of proof and . . . provide[s] guidance to officers' on how to proceed in the face of ambiguity. [Citation.] If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused's unclear intent and face the consequence of suppression 'if they guess wrong.' [Citation.] Suppression of a voluntary confession in these circumstances would place a significant burden on society's interest in prosecuting criminal activity. [Citations.]" (*Berghuis v. Thompkins* (2010) 560 U.S. 370, 381-382.) Accordingly, even if a defendant's partial silence or refusal to answer particular questions is deemed an invocation of the right to remain silent for purposes of *Doyle*, it does not necessarily require the police to terminate questioning at that time. (*Hurd v. Terhune*, *supra*, 619 F.3d at p. 1088.)

16

Accordingly, the statements assertedly admitted in violation of *Miranda* added nothing to the other evidence at trial.

It could be argued that, once defendant made statements to the police, he felt that he had to use the jailhouse phone call to explain those statements. He has never argued, however, that the jailhouse phone call was the product of the asserted *Miranda* violation. He never objected to nor moved to suppress the jailhouse phone call; his motion to suppress was directed exclusively toward his statements to the police.

Finally, we may assume, without deciding, that defendant's statements, "[C]an I get a lawyer?" and "Man, I need a lawyer" were clear and unequivocal invocations of his right to counsel. However, none of the statements that defendant made after that point were admitted at trial. Accordingly, even if the trial court erred by finding that defendant did not unequivocally invoke the right to counsel, the error was plainly harmless.

III

THE SUFFICIENCY OF THE EVIDENCE

TO SUPPORT THE GANG ENHANCEMENT

Defendant contends that there was insufficient evidence to support the gang enhancement to count 2 (dissuading a witness).

"'In considering a challenge to the sufficiency of the evidence to support an enhancement, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the

17

defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] "A reviewing court neither reweighs evidence nor reevaluates a witness's credibility." [Citation.]' [Citation.]" (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170.)

One of the elements of a gang enhancement is that the underlying crime was "committed for the benefit of, at the direction of, or in association with a[] criminal street gang" (the benefit/direction/association element). (Pen. Code, § 186.22, subd. (b)(1).) Another element is that the defendant committed the underlying crime "with the specific intent to promote, further, or assist in any criminal conduct by gang members" (the specific intent element). (*Ibid*.)[5]

"'Expert opinion that particular criminal conduct benefited a gang' is not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang enhancement. [Citation.]" (*People v. Vang* (2011) 52 Cal.4th 1038, 1048.)

With respect to the benefit/direction/association element, the gang expert testified that defendant's crime of dissuading a witness was committed for the benefit of the gang.

---

[5]    Defendant's briefs tend to lump these two elements together. Thus, for example, he asserts that there was insufficient "proof of the defendant's specific intent to benefit a gang by committing the crime."

18

He explained that gang members "want the public or the community that they occupy or frequent to fear and respect them. And a lot of times they glean or garner that respect through intimidation." He added that instilling fear and intimidation in victims also tends to prevent the prosecution of gang members.

Defendant contends that the expert's opinion lacked support in the evidence. The only evidence that he claims was missing, however, was (1) evidence that Waters knew that defendant was a gang member and (2) evidence that the people in the other cars were gang members.

Admittedly, Waters did testify that she did not know defendant was a gang member "until after the fact." However, the jury did not have to believe her. The gang expert testified that defendant had multiple North Side Colton tattoos, including at least two that were readily visible — "NSC" on his middle finger and "NS Colton" on his forearm. Dedrick testified that he did not believe the police could protect him from defendant "[b]ecause of the ties he has with certain people." Waters's two adult sons were friendly with defendant. Waters knew defendant by his gang moniker, Cartoon. The gang expert testified that "the fact [Waters] knew [defendant] by Cartoon leads me to believe there was . . . knowledge of him in regards to a gang capacity." This was sufficient evidence that Waters actually knew that defendant was a gang member.

There was also sufficient evidence that the people in the other cars were members of North Side Colton. The gang expert testified, "Gangs work in groups. That is how they have strength in numbers." In any event, it seems pretty obvious that a gang member

19

in need of five or six accomplices to help him intimidate a witness would turn to his fellow gang members.

Separately and alternatively, even leaving aside whether the crime was committed for the benefit of the gang, there was also substantial evidence that the crime was committed in association with the gang. As just discussed, it was reasonably inferable that the people in the other cars were gang members. "[T]he jury could reasonably infer the requisite association from the very fact that defendant committed the charged crimes in association with fellow gang members." (*People v. Morales* (2003) 112 Cal.App.4th 1176, 1198 [Fourth Dist., Div. Two].)

With respect to the specific intent element, "specific intent to *benefit* the gang is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct by gang members . . . .'" (*People v. Morales*, *supra*, 112 Cal.App.4th at p. 1198.) Moreover, "[Penal Code] section 186.22(b)(1) encompasses the specific intent to promote, further, or assist in *any* criminal conduct by gang members — including the current offenses — and not merely *other* criminal conduct by gang members." (*People v. Albillar* (2010) 51 Cal.4th 47, 65; see also *id*. at pp. 65-66.)

Here, defendant and some accomplices, who were all inferably members of the same gang, circled Waters for the evident purpose of dissuading her from reporting defendant's prior crime. They were all committing a crime together. "'Commission of a crime in concert with known gang members is substantial evidence which supports the inference that the defendant acted with the specific intent to promote, further or assist

20

gang members in the commission of the crime.' [Citations.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 412.)

We therefore conclude that there was sufficient evidence to support the gang enhancement.

IV

THE REFUSAL TO BIFURCATE THE GANG ENHANCEMENT

Defendant contends that the trial court erred by denying his motion to bifurcate the trial of the gang enhancement.

A.      *Additional Factual and Procedural Background.*

In its trial brief, the prosecution argued that it should be allowed to introduce evidence that witnesses were afraid of retaliation. The prosecution asserted that Waters and Dedrick knew that defendant was a gang member.

Defense counsel disputed this, claiming there would be no evidence that any of the witnesses knew that defendant was a gang member. He then asked the trial court to bifurcate the trial of the gang allegations.

The trial court denied the bifurcation request. It explained: "Well, don't forget 352 does not prohibit prejudicial information. . . . The question is whether it is illegally prejudicial, unduly prejudicial . . . . It is a balancing act, not whether it is harmful to the defendant. It is whether or not it is somehow untoward.

"In this case it appears that it is inexorably tied to the underlying offense, the underlying conduct of the defendant, and the underlying conduct of the witnesses. . . . I

21

think it would be a misleading view of the facts to try to separate the sterile facts from the gang involved facts."

B.    *Discussion*.

The trial court has the authority to bifurcate the trial of a gang enhancement in an appropriate case.  (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049.)  The defendant has the "burden 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'  [Citation.]"  (*Id*. at p. 1051.)

However, "the trial court's discretion to deny bifurcation of a charged gang enhancement is . . . broader than its discretion to admit gang evidence when the gang enhancement is not charged.  [Citation.]"  (*People v. Hernandez*, *supra*, 33 Cal.4th at p. 1050.)  A "criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense.  So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation.  [Citation.]"  (*Id*. at p. 1048.)  "Even if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself — for example, if some of it might be excluded under Evidence Code section 352 as unduly prejudicial when no gang enhancement is charged — a court may still deny bifurcation."  (*Id*. at p. 1050.)

We review the denial of a motion to bifurcate for abuse of discretion.  (See *People v. Hernandez*, *supra*, 33 Cal.4th at p. 1048.)

Here, the gang evidence was relevant to the underlying charge of dissuading a witness. As already discussed (see part III, *ante*), there was substantial evidence that Waters knew that defendant was a gang member; there was also substantial evidence that the people in the other cars were defendant's fellow gang members. The gang expert testified that gang members may threaten a witness by surrounding him or her, without making any verbal threat. Waters's awareness that defendant and his accomplices were gang members would make the threat more potent. Thus, the gang evidence was relevant to show the intent to dissuade. (See *People v. Navarro* (2013) 212 Cal.App.4th 1336, 1347.) It was also relevant to show that the attempted dissuasion was carried out by means of an implied threat of force or violence. (See Pen. Code, § 136.1, subd. (c)(1).)

At the same time, the gang evidence was not particularly inflammatory. There was no evidence that defendant was an "OG" or a "shot-caller." Defendant's home had been searched, but no gang paraphernalia had been found there. The gang expert testified to convictions for five predicate offenses — a carjacking, three assaults with a deadly weapon, and unlawful taking or driving of a vehicle. They were not described in detail. The expert specifically testified that they did not involve defendant.

We therefore conclude that the trial court did not abuse its discretion by declining to bifurcate the gang allegation.

V

THE AMOUNT OF THE RESTITUTION FINE

Defendant contends that the trial court erred by imposing the maximum $10,000 restitution fine under Penal Code section 1202.4 without considering his ability to pay.

Under California Supreme Court authority directly on point, defense counsel forfeited this contention by failing to raise it at trial.  (*People v. Nelson* (2011) 51 Cal.4th 198, 227.)

VI

DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ_____
P. J.

We concur:


McKINSTER_____
J.


MILLER_____
J.